Phillip PARADISE, Jr., individually
and on behalf of the class
similarly situated, Plaintiffs,

United States of America, Plaintiff and
Amicus Curiae,

v.

Thomas H. WELLS, as Director of the
Alabama Department of Public Safety,
etc., et al., Defendants,

V.E. McClellan, et al.,
Defendants–Intervenors.

Civ. A. No. 3561–N.

United States District Court,
M.D. Alabama, N.D.

Feb. 1, 1988.

Denis N. Balski, Montgomery, Ala., for plaintiff.

John C. Bell, U.S. Atty., Montgomery, Ala., Cynthia Drabek, Dept. of Justice, Washington, D.C., for U.S.

Charles A. Graddick, Richard N. Meadows, Rosa H. Davis, Montgomery, Ala., for Personnel Director.

Edward L. Hardin, Jr., Birmingham, Ala., Ray Acton, Montgomery, Ala., for other defendants.

Ken Wallis, Montgomery, Ala., Legal Adviser for the Governor.

James S. Ward, Birmingham, Ala., for defendants-intervenors.

## ORDER

MYRON H. THOMPSON, District Judge.

In late 1983, as this lawsuit moved into its twelfth year, this court remarked, regarding a temporary one-black-for-one-white promotion requirement that it had just imposed on the Alabama Department of Public Safety, that

> it is clear that the court and the parties should now contemplate bringing this litigation to an end. The court therefore hopes that ... the remedy imposed today will hasten the day when the Alabama Department of Public Safety is no longer under the supervision of this court.

*Paradise v. Prescott*, 585 F.Supp. 72, 76 (M.D.Ala.1983), *affirmed*, 767 F.2d 1514 (11th Cir.1986), *affirmed sub nom. United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). Some of the parties to this lawsuit have submitted to the court, for its approval, a proposed consent decree which they believe will bring that day nearer. After reviewing the decree and after considering all comments, both for and against it, the court has concluded that the decree should be approved.

### I.

This lawsuit has a long and complex history which is already well documented in reported cases for any interested reader, *see* 767 F.2d at 1516–27; 480 U.S. at ——, 107 S.Ct. at 1058–64, and thus need not be detailed again here. Suffice it to say for background here that, in 1972, this court found that the department had "engaged in a blatant and continuous pattern and practice of discrimination in hiring ... both as to troopers and supporting personnel"; and the court ordered that the department hire one black trooper for each white trooper hired "until approximately twenty-five (25) percent of the Alabama state trooper force is comprised of Negroes." *NAACP v. Allen*, 340 F.Supp. 703, 705, 706 (M.D.Ala. 1972), *affirmed*, 493 F.2d 614 (5th Cir. 1974). More recently, in 1983, this court remarked that

> the department *still* operates an upper rank structure in which almost every

trooper obtained his position through procedures that totally excluded black persons. Moreover, the department is *still* without acceptable procedures for advancement of black troopers into this structure, and it does not appear that any procedures will be in place within the near future. The preceding scenario is intolerable and must not continue.

585 F.Supp. at 74 (emphasis in original). The court then imposed a 50% black promotion quota for each rank, but only if there are qualified black candidates and the relevant rank is less than 25% black, and only so long as the department has failed to develop and implement for that rank an acceptable promotion plan. *Id.*, at 75.

The present parties to these proceedings are a plaintiff class consisting of all black cadets and troopers with the department as well as all black applicants for these positions; the United States of America; two state defendants, the Director of the Alabama Department of Public Safety and the Director of the Alabama Personnel Department; and a small group of white troopers who recently intervened as defendants. After the one-for-one-promotion requirement was affirmed by the United States Supreme Court, the Director of the Public Safety Department personally approached counsel for plaintiffs about settling this litigation. After much negotiation, counsel for the state defendants and plaintiffs submitted a proposed consent decree to the court.

The outline of the consent decree is as follows. The decree calls for the development and implementation of new, valid procedures for hiring and promoting state troopers. In addition, the decree sets numerical goals, which vary by rank, for hiring and promotions. At the cadet and entry levels, the decree provides that, until new, valid selection procedures are developed, black persons will be hired roughly in proportion to their representation among applicants for the jobs. At the corporal rank, the goal is that 18 black and 32 white troopers will be promoted immediately. At the sergeant, lieutenant, and captain ranks, the goals call for black troopers to hold certain percentages of the positions at each rank within one to three years. The decree requires that the Public Safety Department recruit black applicants; that it take certain steps to help achieve the goals set for the supervisory ranks; and that it substantially strengthen its equal employment opportunity program. Finally, the decree has broad provisions prohibiting all forms of discrimination against black persons within the department.

As required by Rule 23(e) of the Federal Rules of Civil Procedure, the court had plaintiffs' counsel notify the plaintiff class about the provisions of the decree and of the right of individual class members to file written objections to the decree and to appear and be heard at a fairness hearing. The court conducted a fairness hearing; it received objections from the United States and the white troopers intervenors and from a few members and non-members of the class.

## II.

It is well established that voluntary settlement is the preferred means of resolving class action employment discrimination cases. *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). It is equally well established, however, that the settlement process is more susceptible that the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is "fair, adequate, and reasonable," *id.*, at 1169; for example, the interests of the class lawyer and the class may diverge, or a majority of the class may wrongfully compromise, betray or 'sell-out' the interests of a minority, *id.* A court also has a duty to ensure that the settlement is not illegal or against public policy. *Harris v. Graddick*, 615 F.Supp. 239, 242 (M.D.Ala. 1985).

In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself. Determining those views and quantifying them in such a manner so as to enable the court to determine whether the settlement is fair is, however, not always easy. For example, if the

dispute over a settlement centers on the *allocation* of a fund among class members, whether the settlement is fair may not be a matter of 'head counts.' In such circumstances, the court should be careful "not [to] allow a majority, no matter how large, to impose its decision on the minority," *Pettway,* 576 F.2d at 1217; the court should be certain "that the burden of the settlement is not shifted arbitrarily to a small group of class members," *id.* However, where the settlement provides for structural changes with each class member's interest in the adequacy of the change being substantially the same, and where there are no conflicts of interests among class members or among definable groups within the class, then the decision to approve the settlement "may appropriately be described as an intrinsically 'class' decision in which majority sentiments should be given *great weight." Id.* (emphasis added). There are approximately 200 black troopers with the Alabama Public Safety Department, and, of these, only 10, or 5%, have filed objections to the settlement. The conclusion is therefore inescapable that not just a majority, but an overwhelming majority, supports the consent decree.

Moreover, the size of this majority takes on even more significance when one considers, as described below, first, the extensive efforts plaintiffs' counsel made to notify and inform all class members about the consent decree and, second, the additional and extraordinary measures this court took when, in an abundance of caution, it effectively gave the troopers additional time after the fairness hearing to *reconsider* their views and voice late objections. Prior to the fairness hearing, plaintiffs' counsel provided notice not only through newspaper advertisements and postings at trooper stations across the state, they mailed individual notices to each and every black trooper and applicant, and they conducted five seminars around the state. During these meetings, which on average lasted two hours,

plaintiffs' counsel spoke with more than half of the approximately 200 currently employed black troopers. During the first portion of the meetings, plaintiffs' counsel outlined the history of the case and explained the terms of the settlement. They also went to great lengths to explain that the settlement was in essence a "trade," and that the black troopers would be giving up certain things in return for the benefits of the consent decree. During the second portion of the meetings, plaintiffs' counsel fielded questions. Prior to the fairness hearing, only *one* black trooper filed an objection, out of a black trooper force of approximately 200; and only *four* black applicants filed objections, out of a black applicant pool of approximately 1000.

At the hearing, however, a number of prominent black public officials informed the court that they strongly objected to the decree. One of these officials, Mr. Thomas Reed, also stated that, from his informal contact with black troopers, he believed that many more black troopers were opposed to the decree than was reflected in the record. Because Mr. Reed's statements deeply concerned the court, the court decided that additional, extraordinary measures were warranted to protect the interests of the black troopers. The court therefore invited Mr. Reed to find these troopers and bring them forward.[1] The court also instructed plaintiffs' counsel to investigate whether it was true that many black troopers were in fact opposed to the decree. The court also required that plaintiffs' counsel inform the black troopers, during the course of the investigation, of the substance of the objections from the black officials. Mr. Reed's attorney was also invited to participate fully in the investigation. Also, in the wake of the fairness hearing, Mr. Reed and plaintiffs' counsel debated the proposed decree on statewide public television. These supplemental opportunities for debate and reconsideration resulted in only nine additional objections from class members.[2]

---

1. After the fairness hearing, Mr. Reed's attorney suggested that many black troopers might be reluctant to come forward because of fear of retaliation from the department. The court informed Mr. Reed's attorney that it would be willing to adopt any reasonable measures he

might suggest to prohibit retaliation and to allay fears of such.

2. If, as Mr. Reed suggested, there are many black troopers who object to the decree, they never came forward to be counted, and, of

The court has not overlooked that this case has over the years received much attention, particularly in the black community. Indeed, it is for this reason that the court eagerly received and carefully considered the objections of Mr. Reed and other black public officials, and, furthermore, took steps to make sure that the black troopers were aware of these objections. However, the court also cannot overlook that it is the black troopers who must live day to day with whatever decision the court reaches, and whose careers and livelihoods will be directly affected by it. A settlement is in large measure a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial. The troopers want the certainty. To force them to take the gamble because others, who have no personal stake at risk, argue that they should, would be unfair, it would be unconscionable; for, should the gamble prove to be a loss, only the troopers will pay. Indeed, the court believes that those black officials who previously objected to the decree would now agree that the court should defer to the sentiment of the overwhelming majority of black troopers, in view of the fact that these troopers, with full knowledge of all objections, have not voiced similar objections, although given an extended opportunity to do so.

### III.

■ In addressing whether a settlement is fair, adequate, and reasonable, a court should also consider the judgment of experienced counsel for the parties. *Pettway*, 576 F.2d at 1215. Here, plaintiffs' counsel, while strongly arguing that on balance the settlement is in the best interest of the black troopers, have candidly and carefully articulated the settlement's pluses and minuses to both the black troopers and the court. Their views are due great weight. Counsel for plaintiffs have vigorously and successfully pursued this case for over a decade in this court, in the appellate court, and in the Supreme Court. No one has questioned in any manner their dedication to the plaintiff class. *Cf. id.* (court should be sensitive to potential conflict between course, this court cannot count them if they do

class and its attorneys, particular where large attorney fees may also be at stake). Indeed, plaintiff's counsel assured the court at the fairness hearing that they were still willing to continue to devote their time and resources to vigorous pursuit of this lawsuit should the court reject the settlement.

### IV.

Finally, with the above considerations in mind, the court should itself assess whether the consent decree is fair, adequate, and reasonable. The court agrees with counsel for plaintiffs that the decree has some significant and substantial pluses and minuses.

### A.

■ The proposed decree gives the plaintiff class more relief as to hiring than they could have obtained through continued litigation. The Public Safety Department's principal present obligations are contained in an order issued by this court on October 17, 1986. There, the court recognized that the department was on the verge of meeting its obligations under the original 1972 one-for-one hiring requirement, and the court required that the department secure court approval prior to implementing any new hiring procedure. The court also later suggested that the department seek such approval quickly so that the issue might be resolved by the time the 1972 hiring requirement expired.

Without the consent decree, if the department failed to obtain court approval of its new hiring procedure, the plaintiffs would probably be entitled to an injunction requiring that the department hire persons in a manner without adverse racial impact, pending development of a valid selection procedure. *See, e.g., Local 28 of the Sheet Metal Workers' International Association v. EEOC*, 478 U.S. 421, ——, 106 S.Ct. 3019, 3037, 92 L.Ed.2d 344 (1986) (Brennan, J.) ("district court may find it necessary to order interim hiring or promotional goals pending the development of nondiscriminatory hiring or promotion procedures"). not come forward.

The consent decree not only provides such relief, it goes much further. First, the decree requires that the department bear the burden of establishing that its new hiring procedure "minimizes" any adverse racial impact to the extent practicable; and, second, and perhaps more importantly, the decree requires that the department make special and extensive recruitment efforts.[3] These additional measures will help ensure that blacks are well represented among applicants for entry-level positions.[4]

### B.

■ The promotion procedures in the consent decree are of much more concern to the court. As stated, the decree calls for the immediate promotion of 50 troopers, 18 black and 32 white troopers. After these promotions, approximately 25% of the trooper corporals will be blacks. Above corporal, the decree sets varying goals and time tables for blacks in all ranks except for that of major, as follows:

a. *State Trooper Sergeants* —within one year, 10 percent; within two years, 15 percent; within three years, 20 percent.

b. *State Trooper Lieutenants* —within eighteen months, 10 percent; within three years, 15 percent; and

c. *State Trooper Captains* —within three years, 10 percent.

Finally, the decree not only requires the development of new, valid promotion procedures, it also requires for all ranks, including that of major, that the department promote in a manner that does not have an adverse racial impact pending the development of such procedures; it also requires that the department bear the burden of proving that the new procedures "minimize" adverse racial impact.

The court's concern about the above provisions arises from the admission of plaintiffs' counsel that the 'trade' here may be significant and substantial. It appears that the decree will require that the plaintiff class abandon not only possible future relief for the certainty of a settlement, it will also require that they abandon significant existing relief: in particular, the 1979 consent decree and the 1983 one-for-one promotion requirement.

The 1979 decree requires that any promotion procedure used by the department meet the twin requirements of no adverse racial impact and 'validity' under the Uniform Guidelines of Employee Selection Procedures; under the decree, therefore, a procedure may not be used if it has adverse impact. In contrast, under the proposed consent decree, which would supersede the 1979 decree, the department would be allowed to implement a procedure *with* adverse impact, as long as the procedure has been validated and the adverse impact "minimized." Plaintiffs' counsel nevertheless argue that the trade is fair and reasonable.

They suggest that it is reasonably debatable whether the 1979 decree could withstand a court challenge. For example, they posit, if the department were to present evidence that, after good faith efforts over a reasonable period of time, it was unable to meet the 1979 decree's twin objectives of validity and no adverse impact, a court might be persuaded to modify the decree to relieve the department of the requirement of no adverse impact. *See Newman v. Graddick*, 740 F.2d 1513, 1520 (11th Cir. 1984) (outlining circumstances where modification of consent decree appropriate). Alternatively, according to plaintiffs' counsel,

---

3. Several black applicants objected to the consent decree; these objections were, however, not as to its structural hiring relief, but because the decree failed to provide them individual relief. Their objections are not well founded. All parties agree that the decree was not intended to, and does not resolve, individual claims; these three persons are still free to pursue any individual claims they may have.

4. At the entry-level, the department is required to continue its recruitment efforts, which, according to plaintiffs, currently yield an appli-

cant pool that is approximately 45% black. For trooper cadet positions, the department must make special recruitment efforts to ensure that the percentage of black applicants is "approximately equal to the percentage of persons earning a high school diploma from a public school in Alabama in the previous year who are black." According to plaintiffs, recent data reflect that approximately 30.3% of the persons earning public high school diplomas are black; and 30.6% of the persons 15 to 19 years old are black.

a court might be even persuaded to vacate the decree in the face of evidence that its implementation proved to be unreasonably burdensome not only on the parties but the judicial process itself. Because it is difficult to predict whether a promotion procedure will have adverse impact before it is administered, and because the "useful life" of the department's promotion procedure is extremely short, the parties and the court could likely face, if the litigation continues on its present course, an unending series of proceedings concerning the adverse impact and validity of one examination after another, for each rank in the department.

Plaintiffs' counsel further, and perhaps most importantly, argue that even if the 1979 decree were not open to serious challenge, the bargain they have struck with the department with the proposed consent decree would still be best for black troopers. The submit that, under the protective requirements of the 1979 decree, blacks could not obtain a substantial number of upper-rank supervisory positions-until early into the 21st Century. Thus, according to plaintiffs' counsel, their settlement reflects a trade of the long-term protections of the 1979 decree for the more immediate and substantial number of promotions in the proposed consent decree. The record before the court reflects that the black troopers were specifically aware of this trade.

Plaintiffs' counsel also point out that the trade of the 1983 one-for-one promotion requirement as well, does not alter their assessment. The court agrees with plaintiffs' counsel that many objectors to the proposed consent decree had the misunderstanding that the 1983 requirement is a permanent feature in the sense that the requirement would be imposed as to a certain rank until that rank is 25% black and would also be imposed whenever the number of blacks in that rank dropped below 25%, so as to maintain the quota permanently. The 1983 requirement was not intended as a permanent measure. As this court stated when it imposed the requirement, "This requirement shall remain in effect as to each rank above entry level until either 25% of the rank is black or the department has developed and implemented for the rank a promotion procedure which

meets the requirements of the prior orders and decrees ...," 585 F.Supp. at 75. *See also United States v. Paradise*, 480 U.S. at ——, 107 S.Ct. at 1072 ("the one-for-one requirement is ephemeral; the termination of its application is contingent upon the Department's own conduct."). Indeed, because the department has been able when necessary since 1983 to come up with acceptable promotion procedures, the 1983 requirement has not been imposed again.

It must finally be remembered that the task before this court is not to decide whether the proposed consent decree is the best deal possible; only those affected, the black troopers, can make that decision. Rather, the function of this court is to determine whether the proposed decree is, at a minimum, fair, adequate, and reasonable. In light of the above representations, the court must conclude that it is.

## V.

■ Finally, the court must address whether the proposed consent decree is legal. The United States and the white trooper intervenors contend that, because of the presence and extent of race-conscious relief, it is not. The court cannot agree.

Race-conscious relief is appropriate here. The scenario this court depicted when it ordered race-conscious relief in 1983 remains today: First, "the department *still* operates an upper rank structure in which almost every trooper obtained his position through procedures that totally excluded black persons," 585 F.Supp. at 74; and, second, "The racial imbalances in the upper ranks ... remain egregious and are now of long duration." *Id.*, at 75. Where there have been such long-standing and substantial racial imbalances produced by intentional discrimination, race conscious relief is legally appropriate. *Cf. Johnson v. Transportation Agency*, —— U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (employer seeking to justify affirmative action plan need *not* point to its own prior discriminatory practices, but need only point to conspicuous sexual imbalances in traditionally segregated job categories).

The extent of the race-conscious relief in the proposed consent decree is also appropriate. It does not "unnecessarily trammel the interests of white employees." *United Steelworkers v. Weber*, 443 U.S. 193, 208–09, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). The decree, which lasts only three years, does not require the discharge or demotion of a white trooper, or the replacement of a white trooper with a black trooper; nor does it not create an absolute bar to the advancement of white troopers. Rather, it is a temporary measure, "designed not to maintain a racial balance, but simply to eliminate a manifest and chronic racial imbalance." 585 F.Supp. at 76. Therefore, because the race-conscious relief here is so limited in scope and duration, it only postpones the promotion for some white troopers; moreover, like a hiring goal, it imposes a diffuse burden, foreclosing only one of several opportunities for white troopers. 480 U.S. at ——, 107 S.Ct. at 1073.

## VI.

In conclusion, the court is convinced that the proposed consent decree is not only "fair, adequate, and reasonable" as well as legal, it is what the overwhelming majority of the black troopers wants. With this showing, approval from this court is mandated.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court that all objections to the proposed consent decree between the plaintiffs and the state defendants are overruled, and that the decree is approved.

### CONSENT DECREE

1. This action was filed on January 3, 1972, alleging that the defendants, the Director of the Alabama Department of Public Safety (Public Safety) and the Director of the Alabama Personnel Department (Personnel), engaged in a continuous and pervasive pattern and practice of excluding blacks from employment in Public Safety in violation of the Fourteenth Amendment to the Constitution of the United States. The private plaintiffs and the defendants now desire to resolve this case without further acrimony and without the necessity of further trial.

2. The defendants' principal obligations in this case are embodied in three orders. The first order, entered by consent on February 16, 1979, requires the defendants, among other things, to utilize promotion procedures that conform with the Uniform Guidelines on Employee Selection Procedures (Uniform Guidelines) and that have little or no adverse impact on blacks seeking promotion. The second order, entered on December 15, 1983, requires the defendants to promote one black trooper for each white trooper promoted under certain circumstances. The judgment of the court of appeals upholding the December 1983 Order was affirmed by the United States Supreme Court on February 25, 1987. The third order, entered on October 17, 1986, requires the defendants to demonstrate that any procedure used for selecting entry-level troopers after the one-for-one hiring requirement is lifted complies with the prior orders in this case and the applicable law. The order also provided that the one-for-one hiring requirement shall be lifted when Public Safety demonstrates that, for a period of three months, at least 24.5 percent of the permanently employed state trooper force is black.

3. There are two substantive motions currently pending before the Court. The first, filed by Public Safety on October 31, 1986, asks the Court for permission to promote twenty-nine entry-level troopers to the position of corporal. The second, filed by Public Safety on November 14, 1986, asks the Court for permission to use new procedures for selecting entry-level troopers. Private plaintiffs and the United States have opposed each motion. If the litigation continues without settlement, further time-consuming and expensive proceedings will be necessary even after the two pending motions are resolved.

4. This Decree is designed to make all further litigation unnecessary, to supplant the defendants' obligations to the private plaintiffs under all other existing orders in this case, to remedy past, pervasive discrimination and the effects thereof, to pro-

vide blacks with equal employment opportunities, and to prevent discrimination in the future.

5. Before agreeing to this Decree, the parties engaged in substantial discovery. Before entering this Decree as its own order, the Court, after notice, held a fairness hearing, heard evidence concerning the propriety of the terms of the Decree, and considered the views of counsel for all parties. Based upon the entire record in this case, IT IS ORDERED, ADJUDGED, AND DECREED as follows:

## JURISDICTION

6. This Court has jurisdiction over the subject matter of this action and the parties hereto. The Court shall retain jurisdiction during the period of this Decree and may enter such other and further relief as the Court may deem appropriate.

## PARTIES

7. The parties to this decree are the private plaintiffs and the defendants.

8. Private plaintiffs are a class of black persons in Alabama who have been, or may be, discriminatorily denied employment opportunities as Alabama State Troopers by the defendants' actions. The class includes black state troopers who have been, or may be, discriminatorily denied promotions within the ranks of the Alabama State Troopers. James E. Jackson, a black trooper sergeant, and Osburn Rutledge, Jr., a black entry-level trooper, are hereby added as named plaintiffs. The Court finds that both are adequate class representatives and that the other prerequisites to maintaining this case as a class action pursuant to Rule 23 continue to be satisfied.

9. The defendants are the Director of the Alabama Department of Public Safety and the Director of the Alabama Personnel Department. Their agents, officers, successors in office, employees, and all persons acting in concert or participation with them shall be bound by the terms of this Decree.

## EFFECT OF DECREE

10. This Decree resolves all issues presently in contention between private plaintiffs and defendants, except as specified in paragraph 45.

11. Public Safety's November 14, 1986 motion for permission to use new procedures for selecting entry-level troopers and October 31, 1986 motion for permission to promote twenty-nine corporals are hereby denied as moot.

12. All prior orders setting forth the obligations of the defendants with respect to the private plaintiffs are hereby vacated.

13. In the event that a higher court rules that any of the remedies in this Decree are not permissible, plaintiffs shall have the option of (a) seeking and obtaining an appropriate modification of the Decree, or (b) abrogating the settlement and resuming litigation.

14. Insofar as any of the provisions of this Decree, or any actions taken pursuant to such provisions to accomplish the objectives of this Decree, may be inconsistent with any state statute, law, or regulation, the provisions of this Decree shall prevail in accordance with the constitutional supremacy of federal law.

## DURATION OF DECREE

15. This Decree shall become effective immediately upon the date of its entry and shall expire on December 1, 1990, unless extended as provided in paragraph 27.

16. If private plaintiffs hereto have commenced proceedings prior to December 1, 1990, alleging noncompliance with this Decree, this Court shall retain jurisdiction over this action until such proceedings are terminated.

## ENTRY–LEVEL POSITIONS

17. In accordance with the provisions of this Decree concerning SELECTION PROCEDURES, defendants shall develop and implement new selection procedures for entry-level troopers and new selection procedures for trooper cadets within two years.

18. While new selection procedures for entry-level troopers are being developed, the ratio of the percentage of troopers hired and completing the trooper academy who are black to the percentage of appli-

cants on the hiring register for such positions who are black, have a high school degree or GED, and meet the age requirement, shall be at least equal to approximately 80 percent of the same ratio for whites.

19. While new selection procedures for trooper cadets are being developed, the percentage of cadets hired and completing any required training who are black shall be approximately equal to the percentage of applicants for such positions who are black, have a high school degree or GED, and meet the age requirement.

20. For the duration of this Decree, the defendants shall continue their recruitment efforts designed to ensure that blacks are well-represented among applicants for entry-level trooper positions.

21. For the duration of this Decree, the defendants shall make special recruitment efforts to ensure that the percentage of applicants for trooper cadet positions who are black shall be approximately equal to the percentage of persons earning a high school diploma from a public school in Alabama in the previous year who are black.

22. Defendants may use separate certifications if necessary to accomplish the objectives in this section of the Decree and shall be allowed to delete names from the hiring register after such names have been on the register for two years.

### SUPERVISORY POSITIONS

23. *State Trooper Corporals*

a. Upon entry of this Decree, defendants shall promote 15 black troopers and 25 white troopers to the position of corporal. After such promotions are made, approximately 25 percent of the trooper corporals will be blacks.

b. Prior to administering future corporal selection procedures, defendants shall develop, in cooperation with a qualified industrial psychologist, an examination announcement informing prospective applicants of the nature of such selection procedures, the characteristics such procedures are designed to assess, and the materials with which the applicants are expected to be familiar.

24. *Goals and Timetables for Remaining Supervisory Positions*—The defendants shall strive to have a workforce in which blacks hold the following percentages of positions at the given ranks within the times specified.

a. *State Trooper Sergeants*—within one year, 10 percent; within two years, 15 percent; within three years, 20 percent.

b. *State Trooper Lieutenants*—within eighteen months, 10 percent; within three years, 15 percent; and

c. *State Trooper Captains*—within three years, 10 percent.

25. In order to reach the goals set forth above, the defendants agree to take the following steps, in addition to those contained in other provisions of this Decree.

a. *Reduce time-in-grade requirements for all positions above State Trooper Corporal*—Currently, defendants require that an applicant for promotion have two years permanent service in the preceding rank. In the future, defendants shall require that applicants have no more than (a) one year permanent service in the preceding rank or (b) six months permanent service in the preceding rank and eighteen months permanent service in the next most preceding rank.

b. *Develop supervisory management training programs*—Such programs shall be designed to benefit potential state trooper candidates for promotion to positions above corporal and to improve the performance of state trooper supervisors in their current positions. These programs shall be implemented within one year.

c. *Alternate Career Paths*—If it appears at any time to the Director of Public Safety that the goals set forth in this Decree cannot be met by taking the steps outlined above and elsewhere in this Decree, the defendants shall endeavor to reach the goals by promoting qualified blacks from within Public Safety regardless of rank or time-in-grade requirements or by intensively recruiting and considering qualified black candidates outside the ranks of Public Safety. Such intensive recruitment efforts shall include special na-

tionwide advertising campaigns designed to reach qualified black candidates, provisions to pay the expenses associated with bringing top black candidates to Alabama in order to provide them with the opportunity to see the work environment and be interviewed, and provisions to pay the moving expenses of black candidates who are selected.

26. The goals set forth above are not rigid quotas. The defendants shall not be required to employ unqualified persons, to displace current employees from their jobs, or to maintain a particular percentage of black troopers within a given rank once the goals have been met. When choosing among qualified candidates, the defendants may take race into account and use separate certifications if necessary to meet the goals.

27. In the event that the goals set forth above are not met by December 1, 1990, despite the good faith efforts of the defendants, sanctions shall not be imposed; however, the duration of this Decree shall automatically be extended until the goals are met.

28. In accordance with the provisions of this Decree concerning SELECTION PROCEDURES, defendants shall develop new selection procedures for each supervisory rank, beginning with the corporal rank, during the life of the Decree; however, the defendants' commitments under paragraphs 23–25 of this Decree shall be neither dependent on nor excused by the development of such selection procedures.

29. If promotions are needed after the goals are met but before the new selection procedures are developed in accordance with the provisions of this Decree concerning SELECTION PROCEDURES, the percentage of persons promoted who are black shall be approximately equal to the percentage of applicants for such positions meeting time-in-grade requirements who are black.

### SELECTION PROCEDURES

30. Selection procedures developed pursuant to this Decree (the new selection procedures) shall conform to the Uniform Guidelines, shall minimize any adverse impact against blacks to the extent practicable,[1] shall be implemented not later than December 1, 1990, and shall be deemed acceptable and binding on the parties for the duration of the Decree.

31. The parties to this Decree have agreed to have Dr. Benjamin Schneider and Dr. Irwin Goldstein develop the new selection procedures in close consultation with Dr. John Veres. Drs. Schneider and Goldstein, professors of psychology at the University of Maryland and principals in the firm Organizational and Personnel Research, Inc., are two of the leading industrial psychologists in the nation. Both are former presidents of the Society for Industrial and Organizational Psychology, Division 14 of the American Psychological Association. Dr. John Veres is a well-qualified industrial psychologist from Auburn University at Montgomery. Because Personnel intends to have a long-term relationship with Dr. Veres, the parties to this Decree consider his involvement in the development of the new selection procedures to be crucial.

32. In the event that the defendants, despite their good faith efforts, are unable to secure the services of Drs. Schneider and Goldstein, plaintiffs' counsel shall select, in consultation with the defendants and the United States, alternative qualified industrial psychologists to develop the new selection procedures in close consultation with Dr. Veres. The alternative psychologists shall also cooperate with any psychologists designated by the United States.

33. The industrial psychologists referred to above who are responsible for developing new selection procedures shall:

a. develop content valid or, where appropriate, other valid selection devices for the positions of State Trooper Cadet, State Trooper, State Trooper Corporal, State Trooper Sergeant, State Trooper Lieutenant, State Trooper Captain, and State Trooper Major;

---

1. Among the procedures to be used to minimize adverse impact shall be banded scoring in the event that a rank-order scoring system is employed.

b. provide Personnel with sufficient information and documentation to show that the development and implementation of the selection devices conform to the Uniform Guidelines and minimize any adverse impact against blacks to the extent practicable; and

c. develop selection devices in such a way that the staff of Personnel, under the guidance of a qualified industrial psychologist, will be trained to continue to assist in developing and administering selection devices for the aforementioned classifications. Fundamental to the accomplishment of this objective is the development of detailed reports outlining the steps used to develop the selection devices. Five professional staff members of Personnel will be sufficiently involved in the project and will receive training from the industrial psychologists referred to above so that they are able to continue to assist in developing valid selection devices after completion of this project under the guidance of a qualified industrial psychologist.

34. The defendants agree to cooperate fully with the industrial psychologists referred to above.

35. The Court orders defendants to pay the reasonable fees and expenses of the industrial psychologists referred to above, other than any psychologists designated by the United States. Invoices, setting out the functions performed and the costs incurred (with appropriate documentation), shall be submitted periodically by the industrial psychologists and shall be paid by defendants consistent with the terms of the contract with the industrial psychologists.

### GENERAL PROVISIONS

36. The defendants shall not discriminate against black applicants, candidates, or employees in any aspect of employment whatsoever at Public Safety.

37. The defendants shall time promotion selection procedures so as to maximize promotional opportunities for blacks within Public Safety.

38. Within six months, Public Safety shall complete a study of trooper assignment practices and training opportunities. Within nine months, Public Safety shall issue guidelines to ensure that trooper assignments are made and training opportunities accorded in a manner that is consistent with the goals and commitments in this Decree.

39. Within 90 days, Public Safety shall assign a corporal (or a supervisory officer of a higher rank), answerable directly to the Assistant Director of Public Safety and stationed in Montgomery, whose primary responsibility shall consist of:

a. monitoring the defendants' compliance with the terms of this Decree;

b. assisting the defendants in carrying out the terms of this Decree; and

c. administering the Equal Employment Opportunity Program within Public Safety.

40. The Equal Employment Opportunity Program within Public Safety shall be enhanced and administered in the manner described in Attachment 1. Public Safety shall enroll the person assigned to administer the program in the four-month EEO training program offered at Patrick Air Force Base in Florida or in an equivalent training program.

### MONITORING AND RECORDKEEPING

41. Defendants shall make quarterly reports on their efforts to comply with this Decree in a format to be prescribed by plaintiffs' counsel within 90 days. Such reports shall be filed with the Court and submitted to plaintiffs' counsel. Plaintiffs' counsel may revise the format for such quarterly reports periodically.

42. Defendants shall retain for the duration of this Decree all records concerning the implementation of this Decree. These records shall be available to plaintiffs' counsel for inspection and copying.

43. For the duration of this Decree, plaintiffs' counsel shall be entitled to contact, and request information from, the industrial psychologists chosen to develop the new selection procedures, the Assistant Director of Public Safety, and the corporal appointed by Public Safety to monitor the defendants' compliance with the terms of this Decree. Such contacts and requests need not be in writing and need not be

cleared with counsel for defendants. Plaintiffs' counsel shall make available to counsel for defendants copies of any written information so provided.

44. Plaintiffs' counsel shall be entitled to reasonable costs and fees for monitoring the defendants' compliance with this Decree. Plaintiffs' counsel shall provide documentation of the number of hours spent, the functions performed, and the costs incurred on a quarterly basis. Counsel shall be entitled to compensation at a rate of $100.00 per hour for attorneys' time and $25.00 per hour for paralegals' time. Subject only to the accuracy of such documentation, defendants shall pay the requested amount within 60 days, without waiving objections as to the amount. Defendants may challenge the number of hours or costs incurred by establishing that the hours or costs were not incurred, were frivolously incurred, or were otherwise patently unreasonable. Such claims shall be resolved by the Court.

## ATTORNEYS' FEES

45. Plaintiffs' counsel shall be entitled to reasonable attorneys' fees and costs incurred in opposing the two motions specified in paragraph 3 and in negotiating and drafting this Decree. If such fees and costs cannot be agreed to, the issue shall be submitted to the Court for resolution. The parties have submitted the issue of plaintiffs' entitlement to fees and expenses for plaintiffs' counsels' work in connection with *United States v. Paradise,* — U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), to the Court for resolution. Should the Court rule that either Public Safety or Personnel, or both, is liable for such fees and expenses, and should such fees and expenses not be agreed to, the issue shall be submitted to the Court for resolution.

## DEFENSE OF DECREE

46. The parties to this Decree shall use their best efforts to obtain prompt judicial approval of the Decree. The parties agree to defend the lawfulness of the Decree in the event that it is challenged by any other party to this litigation or by any other person before the District Court, on appeal, or in any collateral proceeding.

DONE, this 1st day of February, 1988.

Consent to the entry of the foregoing Decree is hereby granted.

/s/ J. Richard Cohen
    J. Richard Cohen
    Morris S. Dees, Jr.
    400 Washington Avenue
    Post Office Box 2087
    Montgomery, AL 36102–2087
    Counsel for Plaintiffs

/s/ Thomas H. Wells
    Thomas H. Wells
    Post Office Box 1511
    Montgomery, AL 36192
    Director of the Alabama Department of Public Safety

/s/ Edward L. Hardin, Jr.
    Edward L. Hardin, Jr.
    Hardin & Hollis
    1825 Morris Avenue
    Post Office Box 11328
    Birmingham, AL 35202–1328
    Counsel for the Director of the Department of Public Safety

/s/ Halycon Vance Ballard
    Halycon Vance Ballard
    Personnel Director
    State of Alabama
    402 Folsom Administrative Bldg.
    Montgomery, AL

/s/ Richard N. Meadows
    Richard N. Meadows
    Assistant Attorney General
    Office of the Attorney General
    Alabama State House
    11 South Union Street
    Montgomery, AL 36130
    Counsel for the Director of the Department of Personnel

Dated: 7/6/87

## ATTACHMENT 1

## ALABAMA DEPARTMENT OF PUBLIC SAFETY COMPREHENSIVE EQUAL EMPLOYMENT OPPORTUNITY PROGRAM

## I. GENERAL POLICY STATEMENT

It is the policy of the Alabama Department of Public Safety to be fair and equitable in all its relations with its employ-

ees and applicants for employment without regard to race, color, religion, creed, sex, age, national origin, ancestry, handicap or marital status. The Department of Public Safety is committed to the concept of equal employment opportunity as a necessary element of basic merit system principals that all persons shall be afforded equal access to positions within the Department limited only by their ability to do the job. Equal opportunity can best be effected through a definitive Affirmative Employment Program. If progress toward achieving equal employment opportunity is to be made every citizen of the State of Alabama and every employee of this Department must realize that policies to remove inequalities cannot be merely passive. Positive steps must be taken to remove conditions which could result in unlawful employment discrimination.

## II. GENERAL OBJECTIVES

1. To assign responsibility and accountability for Equal Employment Opportunity and monitor the progress of the program. The most crucial parts for policy implementation are at the Department Head and supervisory levels where decisions affecting hiring, assignment, training, promotion, compensation and disciplinary action are made.

2. To promote harmonious employee relations by providing training regarding the Department's personnel policies and fair employment practices to supervisory employees, increasing employer awareness and acceptance of race, sex and handicap differences among employees and prohibiting unlawful harassment of employees in the work place.

3. To provide a vehicle for airing grievances concerning allegations of differential treatment based on race or sex and to assure that all discrimination complaints are processed without fear and reprisal, within established time limits and appropriate action is taken following decision.

4. To identify areas of under utilization of protected groups and areas that appear to require special attention or remedial efforts by analyzing employment levels for protected group members throughout the classes of positions within the department comparing same with the available relevant labor force and by evaluating employment practices within the department for purpose of discovering and eliminating possible discriminatory barriers to employment opportunities.

## III. ORGANIZATION AND RESPONSIBILITIES

**A.** *DIRECTOR:* The Department's Director shall have the ultimate responsibility for the success of the Equal Employment Opportunity Program Plan. The Director shall provide for effective communication of and conformance with the requirements of this plan and assure each Division Chief takes such affirmative action as is necessary to promote its goals. The Director shall annually review the program's progress.

**B.** *ASSISTANT DIRECTOR:* The Assistant Director shall accept the responsibility for effectuating progress towards the goals and objectives of the plan, insure that appropriate steps are implemented throughout the department, including respective divisions of the department, that are consistent with and supportive of the plan and hold division chiefs and other supervisory employees accountable for promoting equal employment opportunity in the work place.

Specifically the Assistant Director shall:

(1) Assure that EEO Officer and EEO Counselors are adequately trained in equal employment opportunity, personnel and human resource managements and administration to deal knowledgeably with issues and problems within the department as they arise.

(2) Insure direct live access to top management and establish lines of communication to supervisory personnel, i.e., post commanders, supervisory support personnel, etc., providing written guidance or training in EEO when necessary.

(3) Assist the EEO Officer in making good faith efforts to meet realistic numerical goals and timetables from data provided by the Personnel Office and participate

in identifying problem areas and developing annual updates of the plan.

(4) Evaluate the effectiveness of department supervisory personnel in furthering the progress of the department's efforts in affirmative action.

(5) Establish criteria to measure productivity and cost effectiveness of the EEO staff utilizing fiscal controls to track all resources devoted to EEO.

C. *EEO OFFICER:* The Director of Public Safety shall appoint one person to serve as Equal Employment Opportunity Officer for the Department of Public Safety. He shall be directly responsible to the Assistant Director of the Department. The EEO Officer will be responsible for the following.

(1) Planning and coordinating activities associated with the program;

(2) Assisting members of management and division chiefs in problems identification and resolution relative to any requirement or provision of the program;

(3) Developing draft policy statements, internal and external communication techniques, and to the extent new and important objectives arise, and developing additional affirmative action components of the plan outlining the means through which such objectives will be accomplished;

(4) Developing and implementing audit and reporting systems designed to:

a. Periodically measure the effectiveness of the plan as well as individual divisional efforts.

b. Identify areas that appear to require special attention or remedial effort.

c. Determine the degree to which minority, women and other protected group placement goals are being achieved.

(5) Analyzing and evaluating employment practices and developing methods and strategies for improving the Departments EEO position, increasing protected group employment and complying with merit principle and legal requirements;

(6) Serving as liaison between enforcement agencies, minority/women groups, handicapped groups and other community action groups as appropriate;

(7) Acting as resource person in matters regarding developments in the area of Equal Employment Opportunity;

(8) Receiving, investigating and participating in the complaint process working to resolve internal complaints of alleged discrimination;

(9) Arranging, participating and evaluating training activities related to EEO; preparing reports and informative articles making presentations to Department management, employees and community groups; and

(10) Coordinating efforts and providing technical assistance to the Equal Employment Advisory Committee regarding policies, procedures and resources available to the program.

D. *EEO COUNSELORS:* One person from each District and one person from the Academy Staff have been appointed by the Director of the Department to serve as EEO Counselor. The responsibility of these EEO Counselors shall be:

(1) To discuss with any employee of the Department of Public Safety, at such employee's request, any matters which such employee feels abridges or interferes with such employee's EEO rights, investigate allegations of discrimination and conduct final interviews with employees in an effort to resolve the complaint;

(2) Serve as liaison officers between Department of Public Safety employees and the EEO Officer to insure that all questions or complaints are properly handled according to the established procedures; and

(3) Make every effort to resolve on an informal basis, any matter giving rise to allegations of discrimination, however, if such informal proceedings are not successful, the EEO Counselor shall advise the employee of his right to institute formal procedures and shall assist the employee in seeing that the employee's formal complaint is in correct form and properly filed.

E. *EEO ADVISORY COMMITTEE:* The Departmental EEO Officer shall appoint persons within the Department of Public Safety to serve on an Equal Employ-

ment Advisory Committee. The Committee membership shall include minorities and females from various job levels and divisions within the Department. The committee shall be composed of six (6) people and meet regularly with the EEO Officer to provide two-way communication and suggestions on any aspect of the program.

## IV. RECRUITMENT AND HIRING

1. Analyze and review current recruitment and screening procedures for each job category to identify and eliminate discriminatory barriers.

2. Utilize affirmative recruitment measure for all jobs where underrepresentatives has been identified and maintain file and minority and women applicants to consider for future openings.

3. Establish objectives measures to analyze and monitor the recruitment process—keep records on number of minority/women applicants who apply, who are hired, who rejected and why.

4. Compile and review internal and external data periodically to determine job categories in which minority and women resources may be under utilized. This means analyzing relevant statistical data on the work force to determine the composition of major jobs, the number and kinds of jobs to be filled and comparing with relevant data on job classifications in the state's work force.

5. Preview periodically the interview and screening process to insure equal treatment of all applicants for employment into the Department of Public Safety.

## V. TRAINING AND CAREER DEVELOPMENT

1. A survey of current skills and training of the work force will be conducted to determine the desire and availability of employees, particularly minorities and women, who have skills required to meet staffing needs. Underutilized employees will be identified.

2. Career counseling will be available to all employees on an equal basis.

3. Will ensure there are no unnecessary barriers to full use of skills and training.

4. Programs designed for career development will be instituted periodically and will be offered equally to all candidates.

a. A professionally designed *supervisory/management training* program concentrating on human resource management.

b. *In service training* on various subjects in general police supervision including video cassette programs offered on a monthly basis at local posts. Attendance records shall be maintained.

c. Work schedules will include days when corporals will work with and assume the duties of the sergeant and take command when the sergeant is not on duty. The same will be done for troopers desirous of corporal promotion and offered on an equal nondiscriminatory basis to all promotional candidates.

d. Special assignment training programs within separate divisions of the department will be offered qualified candidates on an equal non-discriminatory basis. Records will be established to insure that all qualified candidates participate in training programs on an equal, nondiscriminatory basis. These special function details include:

  i. *Highway Patrol Division*
  a. Special Weapons and Tactics
  b. Traffic Related Homicide Investigation
  c. Weight Detail
  d. Hazardous Material Response Team
  e. Motor Carrier Safety Unit
  ii. *Drivers License Division*
  a. Revocation and Suspension Officers
  b. Motor Carrier Driver's License Inspection
  iii. *A.B.I. Division*
  a. Narcotics Unit
  b. Auto Theft
  c. Missing Children

e. Brochures will be prepared for all corporal candidates outlining the duties of the corporal and subject matter the state trooper should concentrate on to prepare for promotional examination. The same

will be prepared for corporal who desire to such promotion to sergeant.

## VI.   COMPLAINT PROCEDURE

A.   All employees shall first discuss any matters which such employee feels abridges or interferes with such employees' equal employment opportunity rights with the EEO Counselor.   Such matters may involve (but are not limited to) recruiting, hiring, transfer, promotion, training, compensation, benefits, and disciplinary actions.

B.   If the resolution proposed by the EEO Counselor is not satisfactory to the employee, the employee may file a written complaint of discrimination with the EEO Counselor.   The complaint will be made on the Employee Grievance Form in duplicate. The original will be submitted to the EEO Counselor.   The copy will be retained by the employee.   Within five (5) working days from the date of filing, the EEO Counselor will forward the complaint to the Departmental EEO Officer.   The EEO Counselor may submit any facts or comments in memorandum form along with the complaint to the Departmental EEO Officer.

C.   The Departmental EEO Officer will investigate the complaint.   After reviewing the complaint with the Director, the Departmental EEO Officer shall respond in writing within ten (10) work days to the complaint explaining the situation or any action taken to correct the problem.

D.   If the employee does not receive an answer within thirty (30) days from the date the complaint is filed, the employee may submit a copy of the original complaint directly to the Director of the Department of Public Safety.

E.   A person may appeal the action taken directly to the State Personnel Board. The appellant and the person or persons responsible for the alleged discriminatory action shall have the right to be heard by the Board or a special hearing agent and to present evidence.   If the Board finds after the hearing that there was discrimination, it shall order appropriate corrective action and its decision shall be final.

## VII.   COMMUNICATING POLICY

The Department of Public Safety recognizes that in order for an EEO Program to be effective it must be communicated throughout the department and throughout the State of Alabama.   Effective means of communicating the Department's commitment to EEO will include:

A.   Issuing formal statements of the EEO Program, signed by the Director, to all employees, managers and supervisory management employees, and job applicants.

B.   Communicating the importance of harmonious race relations in all supervisory/management programs and at the training academy.

C.   Posting the EEO Plan of Action on each "official" Bulletin Board throughout the Department of Public Safety.

D.   Orienting all employees, new and old, to the purpose of EEO and the function of Departmental EEO Counselors.

E.   Posting names, addressed, and telephone numbers of the Departmental EEO Counselors in the areas where employees work, including at each Highway Patrol Post.

F.   Defining for all employees the procedures for processing discriminatory complaints.

G.   Encouraging active participation with and recommendations to the EEO Advisory Committee.

H.   Including in all Public Service Advertisements a notice that the Department of Public Safety is an "Equal Opportunity Employer".