Johnny REYNOLDS, et al., Plaintiffs,

v.

Royce KING, et al., Defendants.

Civ. A. No. 85–T–665–N.

United States District Court,
M.D. Alabama, N.D.

Sept. 21, 1990.

Julian McPhillips, McPhillips, De Barde-laben & Hawthorne, Montgomery, Ala., Rick Harris, L. Gilbert Kendrick, Moore, Kendrick, Glassroth, Harris, Bush & White, Montgomery, Ala., for plaintiffs-intervenors, except Belser.

James Evans, Atty. Gen., Frank Ussery, Asst. Atty. Gen., Montgomery, Ala., for Ballard and State Personnel Dept.

Patrick Sims, Mobile, Ala., for Highway Dept., King and Hunt.

Florence Belser, pro se.

Richard Ebbinghouse, Robert Wiggins, Birmingham, Ala., for intervenor Parker.

Claudia Pearson, Birmingham, Ala., for intervenor Johnson.

Robert M. Weinberg, Office of Atty. Gen., Montgomery, Ala., for Ala. Highway Dept.

## ORDER

MYRON H. THOMPSON, Chief Judge.

The plaintiffs in this complex class-action lawsuit charge that the Alabama Highway Department has illegally discriminated against them in employment because they are African–American. The plaintiffs rest their lawsuit on Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C.A. §§ 2000e through 2000e–17; the fourteenth amendment to the United States Constitution as enforced through 42 U.S.C.A. § 1983; and 42 U.S.C.A. § 1981. The court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 2000e–5(f)(3). This cause is now before the court on a joint request by counsel for all parties for approval of a proposed consent decree. After careful consideration of the proposed decree and of the written and oral representations made in support of and in opposition to it, the court reluctantly concludes that it cannot approve the decree.

## I. PROCEDURAL BACKGROUND

The six plaintiffs in this lawsuit are Johnny Reynolds, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherrie Allen, and Jeffrey Brown. Reynolds filed this lawsuit on May 21, 1985, and the other plaintiffs were allowed to intervene over the next three years. The defendants in this lawsuit are the Alabama Highway Department and its Director, the Alabama Personnel Department and its Director, and the Governor of the State of Alabama.

The six plaintiffs allege in their complaint that several years ago the highway department undertook a reorganization and reclassification of its workforce; according to the plaintiffs, departmental employees are now divided according to merit and non-merit systems. The plaintiffs allege that the highway department has utilized its reclassification procedures within the merit system to discriminate against black persons in hiring and promotions. They further allege that the highway department has knowingly allowed racial harassment of its black employees. The plaintiffs' claims of racial discrimination with regard to hiring and promotions are based on theories of both "disparate treatment" and "disparate impact." The plaintiffs seek such class-wide relief as hiring and promotion "goals" for black employees, new standards and procedures for hiring and promotions, and a broad injunction prohibiting the highway department and its officials and employees from engaging in racial discrimination and harassment. The plaintiffs also seek such individual relief for themselves and the class members they represent as back pay, instatements, and promotions.

The court certified three classes in this lawsuit pursuant to Fed.R.Civ.P. 23(a) and (b)(2). The first class certified by the court consists of all black merit system employees of the highway department employed since May 21, 1979. This class is represented by Reynolds, Maxwell, and Boleware. At the time of certification, the evidence revealed that Reynolds has worked as an Engineering Assistant I at the highway department in Montgomery, Alabama since 1983. Maxwell and Boleware work for the highway department in Alexander City, Alabama. Boleware has held the position of Engineering Assistant I since 1978. Both Boleware and Reynolds allege, among other things, that the highway department has passed them over for promotions because of their race. Maxwell applied on several occasions for work at the highway department and was hired as a clerical aide in 1983. Since that time she has been laid off and rehired at intervals sufficiently frequent to prevent her from attaining permanent status. Maxwell contends that this treatment is part of a pattern practiced by the department upon black persons because of their race.

The second class certified by the court consists of all black non-merit system employees of the department who have unsuccessfully sought employment as merit system employees since May 21, 1979. This class is represented by Belser. At the time of certification, the evidence revealed that Belser had worked for the highway department in Montgomery as a temporary clerical aide during 1984. She alleges that while employed as an aide she was required to perform the duties of a laborer rather than clerical tasks. When Belser's temporary position expired, she reapplied for permanent positions as a laborer and as Clerk I. She contends that the department's refusal to hire her for these jobs constituted race-based discrimination.

The third class certified by the court consists of all black non-employees who have unsuccessfully applied for merit system employment since May 21, 1979. This class is represented by Allen and Brown. At the time of certification, the evidence revealed that Allen had applied for and was refused a position as a graduate civil engineer with the highway department in late 1982 or early 1983. She is currently employed in that capacity with the Georgia Department of Transportation and she alleges that she was not hired by the Alabama Highway Department because of unlawful race discrimination. Brown too had applied for the position of graduate civil engineer and was not hired. He avers that, but for his race, he would have been hired for that position.

On the eve of trial, which was to last two to three weeks, counsel for all parties were able to agree to a proposed consent decree. At that point the parties had completed extensive discovery; they had produced volumes of documents, answered numerous questions posed to each other, and deposed many witnesses, including highway officials, the named plaintiffs, and several expert witnesses for both the plaintiffs and the defendants. There were also many meetings between plaintiffs and their counsel, between defendants and their counsel, and between counsel for plaintiffs and defendants. The court provisionally approved the proposed decree after finding that it might be within the range of possible approval. The court also set a hearing to determine whether the decree should be finally approved for all three plaintiff classes pursuant to Fed.R.Civ.P. 23(e). Pursuant to the court's direction, the highway department and the state personnel board then mailed court-approved notices to 1,236 former and present employees and to 2,840 applicants for employment. The notice informed the three plaintiff classes of the nature of the lawsuit and the proposed consent decree, and it included a copy of the proposed decree. The notice also informed class members of the fairness hearing and of their right to appear at the hearing and to submit written objections to the decree before the hearing. The court received approximately 200 objections, including four from the six named plaintiffs.

The court later conducted the fairness hearing as scheduled. Counsel for all parties orally explained the history of the liti-

gation and the terms of the proposed decree to the court and to the class members who were present. They also went to great lengths to explain that a settlement is in essence a "trade," and that the class members would by definition be giving up something in return for the benefit of the proposed decree. Class members were then allowed to ask questions of counsel and to voice oral objections to the decree. There were between one- and two-hundred class members present at the hearing, and it was apparent to the court that the overwhelming majority of those present strongly opposed the settlement. Also, of the 25 or more persons who spoke at the hearing, all but three or four voiced strong opposition to the settlement. The hearing lasted several hours.

## II. THE PROPOSED CONSENT DECREE

The 132–page proposed consent decree at issue in this case provides for extensive injunctive and monetary relief. The centerpiece of the decree is the hiring and promotion goals which will apply to all merit system positions in the highway department. The decree provides as to hiring that the goal of the highway department will be to make appointments to all merit system jobs in which there are more than four appointments in a year in such a way that the percentage of black persons hired for the job will correspond to the percentage of blacks on the open competitive register for that job. The decree similarly provides as to promotions that the goal of the highway department will be to make promotions to all merit system jobs in which there are more than four promotions in a year in such a way that the percentage of black persons promoted to the job will correspond to the percentage of blacks on the promotional register for that job. These hiring and promotion goals are temporary, and will last only until December 31, 1993.

The decree has several provisions which apply primarily to engineering jobs and jobs related to engineering. First, the decree provides for "banded" ranking for nine engineering jobs, five jobs related to engineering, and three jobs not related to engineering. Under this procedure, persons within certain ranges on the selection register will be banded together such that any name within a band may be selected equally with any other name. This procedure will purportedly increase the number of blacks in the group from which the highway department may select for a position. Second, the department has also agreed to expand the source of potential black applicants by recognizing civil engineering degrees from non-accredited as well as accredited colleges. And finally, the decree requires that the highway department offer a graduate civil engineer job to ten class members who counsel for all the parties have concluded have "arguable" claims to those positions; two of these class members are Brown and Allen, two of the named plaintiffs.

The decree provides for substantial monetary benefits to the six named plaintiffs. Under the decree, the named plaintiffs are to split $95,259 as follows:

| | |
|---|---|
| Reynolds | $20,000 |
| Maxwell | $15,000 |
| Boleware | $15,000 |
| Belser | $ 5,000 |
| Brown | $17,433 |
| Allen | $22,826 |

In addition, approximately 700 other members of the three plaintiff classes who, according to counsel for both plaintiffs and defendants, have colorable claims to back pay, will receive what can only be characterized as token sums of approximately $371 each out of a monetary fund of $259,-741. The other members of the three classes will receive no financial benefits at all.

The decree requires that the highway department engage in substantially more intensified recruiting of black candidates at certain colleges and universities, particularly predominantly black ones; and it requires that the department substantially strengthen its training program, its equal employment opportunity program, and its procedures for handling and resolving complaints of race discrimination.

The decree has extensive reporting provisions. The highway department is required to submit periodically to the court reports of the department's efforts to implement the decree. The department is also required to respond to reasonable requests for information from counsel for plaintiffs regarding implementation of the decree. Finally, the decree provides that, subject to approval by the court for reasonableness, plaintiffs' attorneys will receive $145,000 for their fees, expenses, and costs.

## III. ASSESSMENT OF THE PROPOSED CONSENT DECREE

 Courts have stated many times that voluntary settlement is the preferred means of resolving class action employment discrimination disputes. *See, e.g., Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983). However, because the class action settlement process is more susceptible than adversarial adjudications to certain types of abuse, a court faced with a settlement in a class action has a heavy, independent duty to ensure that the settlement is "fair, adequate, and reasonable." *Holmes*, 706 F.2d at 1147. The court also has the duty to make sure that the settlement is not illegal or against public policy. *United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980).[1]

It would appear at first blush that determining whether these requirements have been met would be a simple and straightforward task. After all, "the task before this court is not to decide whether the proposed consent decree is the best deal possible," *Paradise v. Wells*, 686 F.Supp. 1442, 1447 (M.D.Ala.1988), but to determine whether, at a minimum, it is fair, adequate, and reasonable and whether it is legal. A settlement implicitly means settling for less than all that is sought; it is "a reasoned choice of a certainty over a gamble, the certainty being the settlement and the

gamble being the risk that comes with going to trial." *Id.* at 1446.

However, as is becoming true more frequently in these complex employment discrimination cases, determining whether a settlement meets the above standards can be as time consuming and difficult as a trial itself because it often requires the assessment of numerous issues, many of which can be as legally and factually daunting as any that might be presented in the trial itself. Indeed, it could be argued that such was the case here. The proposed consent decree presented by counsel for the parties has posed many difficult issues, some of which point in favor of approval of the decree and some of which counsel against it.

### A.

 In assessing the fairness of a proposed compromise, the court must consider "the rights and interests of each class member." *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). In particular, the court must be certain that the settlement "does not unfairly impinge on the rights and interests of dissenters." *Id.* At the very least, the court must find that the agreement was entered into without fraud or collusion. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984). Here, there is no evidence of actual fraud or collusion between the parties or their attorneys. Other factors, however, clearly counsel that the court should reject the settlement, at least on the present record.

### i.

First, the court is troubled by the fact that under the proposed decree the six named plaintiffs will receive substantial monetary benefits while all other members of the three plaintiff classes who are entitled to benefits will receive only token amounts. The record does not adequately substantiate that this preferential treat-

---

**1.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

ment for the named plaintiffs is reasonable and fair.[2]

The Eleventh Circuit Court of Appeals has instructed that, "Although there is no rule that settlements benefit all class members equally, a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983). The court continued that, "When a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a substantial burden falls upon the proponents of the settlement to *demonstrate and document* its fairness." *Id.* at 1147 (emphasis added). "The inference of unfairness," according to the court, "may be rebutted by a *factual showing* that the higher allocations to certain parties are rationally based on legitimate considerations." *Id.* at 1148 (emphasis added).

Here, the named plaintiffs—in particular, Brown and Allen—will receive substantial back pay awards as a part of their monetary benefits.[3] Class counsel attempt to justify this difference in treatment with the argument that, in their judgment, Brown and Allen have meritorious claims entitling them to back pay. Class counsel admit that they have not performed an individual assessment of the claims of the hundreds of other class members who will receive only token awards. They have, therefore, not justified why Brown and Allen, or any other named plaintiff whose award is based on the merit in his or her claim, should receive this individualized treatment, when all other members of the three classes will receive at most only token sums without any individualized treatment of their claims.[4]

Moreover, more than statements from class counsel are needed to rebut the inference of unfairness which arises from a settlement which favors named plaintiffs. As the Eleventh Circuit explained in *Holmes*, "the attorney's opinion is an insufficient basis upon which to approve the disproportionate and facially unfair allocation of this back pay award." 706 F.2d at 1150. Class counsel have produced no evidence to support the payment of substantial back pay awards to named plaintiffs but not to any other members of the plaintiff classes.[5]

ii.

Second, the court does not believe the record is sufficient to explain why the court should approve a decree which will have the dramatic and drastic effect of barring, whether the class members agree or not, any and all now existing individual claims these class members may have. In *Holmes*, the Eleventh Circuit indicated that in cases such as this—in which a plaintiff class is certified under subsection (b)(2) of Rule 23 of the Federal Rules of Civil Procedure and where the plaintiffs seek both broad class-wide injunctive relief as well as individual relief such as back pay, promotions, and instatement—a court confronted with a settlement must assess whether the class in the case is a pure subsection (b)(2) class or is a hybrid of subsections (b)(2) and (b)(3), with the result that the individual claims of class members cannot be cut off without their permission. 706 F.2d at 1151–61.

The court explained that subsection (b)(2) "visualizes claims common to the entire class," such as for "final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Id.* at 1155.

---

**2.** Class counsel have explained that most of the class members will receive no benefits because their claims fall outside Title VII's limitation period for back pay awards.

**3.** The court understands that the named plaintiffs' awards include more than benefits for back pay. The payments are also for assisting in the litigation and for any harassment the named plaintiffs may have suffered because of their open involvement in this litigation.

**4.** Defense counsel suggest in their brief that the burden should be on those objecting to demonstrate that a disparate allocation is unfair. The court cannot agree. The burden should be on class counsel, who apparently fashioned the relief, to show it is fair.

**5.** Defense counsel admit in their brief that, in light of the teachings in *Holmes*, whether the disparate allocation of benefits in the proposed decree is fair is a "close call."

In contrast, under subsection (b)(3), there are common questions which predominate over any questions that affect individual parties, but there are also individual heterogenous claims with diverging interests. *Id.* at 1156. The court then reasoned that class-action employment discrimination cases certified under subsection (b)(2) may often take on both (b)(2) and (b)(3) characteristics. The court explained that these cases are usually tried under a bifurcated procedure. At the first stage, the class attempts to demonstrate liability as to the whole class; this "stage stresses claims common to the class as a whole, and if liability is found, results in injunctive or declaratory relief." *Id.* at 1157. If the class makes out a *prima facie* showing of discrimination, then it is entitled to move on to the second stage with the presentation of individual claims. *Id.* at 1158. At the second stage, the court resolves whether a particular employee is in fact a member of the covered class, has been damaged as a result of the discrimination, and thus is entitled to individual relief, including back pay. "This bifurcated procedure reflects a sensitivity toward the *heterogeneous* quality of the claims resolved at the monetary relief stage and evinces a recognition of the need to protect the interests of absent class members at that stage." *Id.* (emphasis added).

In *Holmes,* the appellate court found that, because the named plaintiffs received more back pay than the other class members, the individual claims in the lawsuit could not be considered to be homogenous but must be unique and atypical. The court then concluded that, because of this, class counsel could not cut off the individual claims of the plaintiff class without their permission, but must give them the right to "opt out" of the settlement. 706 F.2d at 1160.

This court could, and perhaps should on the present record, similarly conclude that, because the named plaintiffs will receive more back pay than the other class members, the individual claims in this lawsuit cannot be considered to be homogenous but must be unique and atypical, with the result that those class members who wish not to join in the proposed consent decree should be allowed to pursue their own claims. In any event, class counsel have not addressed this issue; they have generated no record from which this court could conclude that the prohibition in the proposed decree—that class members who want no part of the proposed settlement are still be bound by it and may not pursue their own claims—is fair, or even allowable under Rule 23.[6]

iii.

Third, the court is uneasy about the provision in the proposed consent decree which expressly authorizes the highway department to retain the requirement of "engineer in training" (EIT) status for those applying for the job of graduate civil engineer. Because a person acquires EIT status by passing an examination known as the "Fundamentals of Engineering" which is administered by the National Council of Engineering Examiners, the highway department is in effect making this examination a prerequisite for employment as a graduate civil engineer. Many objectors at the fairness hearing voiced concerns that the EIT requirement would have a disproportionate adverse impact on black applicants.

Class counsel have responded that, when the whole picture is seen, their agreement to allow the department to continue with the requirement is fair and reasonable. As the court will explain later, class counsel rightfully have some serious concerns that under current law they could prevail on their disparate impact challenge to the EIT requirement. They say that allowing the highway department to retain the EIT requirement in return for including in the consent decree a requirement of temporary employment-and-promotion goals based on race for all merit system jobs, including that of graduate civil engineer, was a fair trade in light of the current state of the

6. For example, in *Paradise v. Wells,* 686 F.Supp. 1442, 1447 n. 3 (M.D.Ala.1988), where plaintiffs challenged long-standing discrimination in the Alabama Department of Public Safety, the proposed consent decree did not resolve individual claims.

law. Class counsel further argue that the reasonableness of the bargain is even more evident when one considers that the highway department also agreed to expand the source of potential black applicants by recognizing civil engineering degrees from non-accredited as well as accredited colleges.

Class counsel may very well be correct in their assessment of their challenge to the EIT requirement. Nevertheless, the court is concerned as to whether the EIT requirement is a fair bargain because, after all, the goals would be only temporary and the EIT requirement would be permanent.[7] The court is also concerned that the proposed decree expressly authorizes the EIT requirement and thereby implies that the court has given its imprimatur. Indeed, class counsel state in their brief that "the consent decree is, in effect, a *finding* by the Court that the [EIT] requirement is not unlawful under Title VII" (emphasis added); class counsel have, however, produced no evidence to support such a finding. The court believes that, under these circumstances, there should be some evidentiary showing regarding the appropriateness of the requirement before mantling the plaintiff classes with something to which they so strongly object.

### iv.

Fourth, the court is deeply concerned that the proposed consent decree may lack adequate support from class members. Counsel for the parties correctly observe that here there were only approximately 200 written and oral objections to the proposed consent decree and that these objectors constitute a very small percentage of the total number of members in the three plaintiff classes. They further observe that over one-half of these objections were complaints that a class member was not included in the group to receive the token monetary benefits. Counsel also correctly argue that this court cannot therefore properly ignore the fact that an overwhelming majority of the class members have not filed objections to the proposed decree. The court does not believe, however, that it should conclude from these naked figures that there is class-wide support for the proposed consent decree. A court's obligation to assess whether a proposed compromise is fair requires much more scrutiny than this.

 First of all, majority rule does not always control in class-action settings. A court must recognize that the interests of different class members may diverge, and the court must be careful to scrutinize whether under the proposed settlement certain of these interests are "wrongfully compromised, betrayed, or 'sold out.'" *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). If the claims presented and the relief afforded are homogenous, then settlement is an "intrinsically 'class' decision in which majority sentiments should be given great weight". *Id.* at 1217. But if the claims are heterogenous, then the fact that a majority of the class members favor settlement would not be dispositive. The court must "ensure that the burden of the settlement is not shifted arbitrarily to a small group of class members." *Id.* Here, the court must be watchful that, with the award of token benefits to a large number of class members, class counsel have not, knowingly or unknowingly, sacrificed the claims of the few with meritorious claims in order to get the vote of the majority whose claims are either marginal or clearly without merit; in such an instance, the few who have the meritorious claims would be bearing the burden of the settlement. In any event, as the court has already explained, the record is unclear as to whether the individual claims are sufficiently homogenous to allow majority rule.

 Moreover, looking only to the appropriateness of the class-wide injunctive relief in the proposed decree which, of course, would be an intrinsically class deci-

---

7. The court is also concerned about the relationship between the EIT requirement and the goals. The record is unclear as to whether the EIT requirement, should it hinder the ability of blacks to get on the register, could undermine the effectiveness of the goal provisions.

sion, the court still has deep reservations about the adequacy of class support. Even in these circumstances, majority rule cannot be necessarily dispositive. In some cases a court can properly interpret the absence of objections from a majority of the plaintiff class as indicating support for the proposed compromise. For example, this could be true where substantially all members of the class are easily identifiable and have demonstrated significant interest in the litigation. However, where the class is large and there is no evidence that most of its members are particularly interested in the litigation, a court should view the absence of any objections from this majority with caution. In such cases, because the majority of the plaintiff class is simply indifferent to the litigation, counsel for the parties could always claim support for the settlement. This does not mean, however, that the court should ignore this silent majority; nor does it mean that in such cases a court should always deny approval in the face of strong and open opposition by some class members.[8] What this does mean is that the court must look beyond the numbers to the total reality of the circumstances presented and from these circumstances attempt to extrapolate some picture of the true support for the proposed decree. *See Pettway*, 576 F.2d at 1217 (depending on the peculiar circumstances presented in a case, majority rule may or may not be the test for measuring class-wide support). In making this assessment, a court should consider at least the following factors: the number of those who have filed objections to the settlement; the number of those who have voiced no opposition; the number of those who have demonstrated some affirmative support for the settlement; how the named plaintiffs view the settlement; the overall level of interest from class members in the litigation and the settlement; whether that interest is coming from an identifiable segment of the class; and whether the settlement would have a substantially greater effect on one segment of the class than another.

Here, the parties have submitted evidence that an overwhelming majority of the three plaintiff classes have not filed objections to the proposed consent decree. However, the significance of this evidence is substantially undermined by other compelling evidence. First, the record reveals less than ten class members who affirmatively support the decree, and the support from two of these, Allen and Brown, is suspect because it appears that they will benefit substantially more than anyone else under the decree. Not only will Brown and Allen receive substantial awards as named plaintiffs, they are also two of the ten class members who will receive offers of employment under the settlement. Second, the only named plaintiffs who support the proposed decree are Brown and Allen, and, as stated, they are not typical beneficiaries under the decree.[9] And finally, the court has the impression from the record that the class members who have shown the most interest in this litigation are the current employees of the highway department, and that the overwhelming majority of these class members are strongly opposed to the proposed decree. These class members are entitled to special consideration because they will be affected most by the proposed decree's injunctive provisions; after all, they will have to live with the decree on a day-to-day basis.

The court believes that from this evidence, viewed as a whole, the following picture emerges: of those who are truly interested in this case and who are truly

**8.** In *Paradise v. Wells*, 686 F.Supp. 1442 (M.D.Ala.1988), the court approved a settlement resolving the hiring and promotion of black Alabama state troopers. There, the court looked at not only the fact that the majority of the troopers filed no objections to the settlement, the court also carefully considered the circumstances surrounding the majority's silence.

**9.** The court recognizes that it is also reasonable to infer that the other four named plaintiffs are withholding support for the proposed decree because they do not believe their individual relief is adequate. However, this dispute over individual relief, which has permeated the fairness hearing process, highlights again the court's concern as to whether all individual claims can be lumped together for disposition pursuant to Rule 23(b)(2).

affected by its outcome, the majority opposes the proposed settlement; only the attorneys and a few class members really want the decree, be it good or bad.[10] To impose the decree under these circumstances would belie the notion that the decree is based on "consent."

### v.

Lastly, counsel for the parties have failed to address the fact that recent cases from the United States Supreme Court raise a significant question as the legality of the hiring and promotion goals in the proposed consent decree. *See, e.g., Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). The legality of the goals is critical to the court's assessment of the fairness of the proposed compromise for at least three reasons. First, if the goals are illegal, the court cannot approve them. The court cannot

approve a settlement that is illegal or against public policy.[11] *United States v. City of Alexandria,* 614 F.2d 1358, 1362 (5th Cir.1980). Second, there is a substantial possibility that in the future the goals will be challenged by white employees of the highway department and by white applicants for positions with the department.[12] *See Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). There is the real risk that the goals could not survive such a challenge. Because the goals are the centerpiece of the proposed decree and because class counsel made significant concessions in return for the goals, the value of the decree to the plaintiff classes would be substantially diminished if it should later turn out that the goals are unenforceable. Third and finally, the court is concerned that the members of the plaintiff classes are unaware of the risk that the goals may or may not be enforceable. Class members need this information in

10. Should the parties submit a new settlement, the court believes that they should present some affirmative evidence of what the overall sentiment of the blacks in the highway department is toward the settlement. For example, in *Paradise v. Wells,* counsel for the plaintiff class of black state troopers conducted meetings around the state with black troopers prior to the fairness hearing; and, after the fairness hearing revealed that there was still some uncertainty as to whether the members of the plaintiff class who did not object actually supported the proposed settlement, counsel made further inquiry to determine the level of black trooper support.

11. Counsel must show, first, the race-conscious relief is necessary and, second, that the form of the race-conscious relief is appropriate. For example, this court recently found that such relief in a consent decree was necessary to address "long-standing and substantial racial imbalances produced by intentional discrimination." *Paradise v. Wells,* 686 F.Supp. 1442, 1448 (M.D.Ala.1988). The court further found that the relief was appropriate because it did not "unnecessarily trammel the interests of the white employees." *Id.,* at 1449, *quoting United Steelworkers v. Weber,* 443 U.S. 193, 208–209, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). The relief, which was to last only three years, did not require the discharge or demotion of any white employee, or the replacement of any white employee with a black one; nor did it create a significant bar to the advancement of any white employee. It was only "a temporary measure, 'designed not to maintain a racial balance, but simply to eliminate a manifest and chronic racial imbalance.'" *Paradise v. Wells,*

686 F.Supp. at 1449, *quoting Paradise v. Prescott,* 585 F.Supp. 72, 76 (M.D.Ala.1983), *aff'd,* 767 F.2d 1514 (11th Cir.1985), *aff'd sub nom. United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).

12. At one point, the court voiced concern over the fact that the proposed settlement limits banded ranking to the engineering jobs primarily. Counsel for plaintiffs explained that the banded ranking was included in the consent decree to facilitate the ability of the department to meet the decree's racial goals for hiring and promotions. Apparently, it is felt that this would be most difficult to do with regard to the engineering and related positions, and thus banded ranking was included for these positions. Class counsel point out that, in any event, the department is required by the decree to meet certain racial goals for hiring and promotions for all merit positions, irrespective as to whether there is banded ranking for the position or not. Therefore, according to class counsel, banded ranking is a merely one of the means by which the department can meet the required racial goals; the critical provision in the decree is that the department must meet these goals.

Class counsel appear to be suggesting that the highway department may go beyond the certifications to meet the racial goals. The department's position as to this critical issue is unclear. In other words, the record is unclear as to whether the goals could require that the highway department pass over whites to reach blacks.

order to make a informed decision as to whether to support the proposed decree. The record before the court does not reflect that this was done.

### B.

The court recognizes that there are also a number of factors which counsel in favor of approval of the proposed settlement. They are the complexity, expense, and likely duration of the litigation if the case went to trial; the stage of the proceedings and the amount of discovery completed; the opinion of experienced counsel; the factual and legal obstacles to success on the merits; and the possible range of recovery and certainty of damages. *Parker v. Anderson,* 667 F.2d 1204, 1211 (5th Cir. 1982), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

### i.

There is no question that if this case were to proceed to trial the resulting litigation would be extremely prolonged, complex, and expensive. At issue in this lawsuit is an array of employment practices at the highway department affecting three large classes of persons over an extended period of time. A trial on the merits would be quite an undertaking. As explained previously, it would involve at least two lengthy stages of litigation, the first being to determine whether class-wide liability has been established and, if so, what class-wide relief would be appropriate; and the second being, should the plaintiffs prevail in the first, to determine individual liability and relief for the hundreds of class members. Moreover, the settlement is not the product of ignorance. Before the parties reached a final proposed settlement, extensive discovery had been completed and each side had assessed the relative strength of its case.

The court also cannot overlook the opinion of experienced counsel. Here, class counsel, while strongly arguing that on balance the proposed decree is in the best interest of the members of the three plaintiff classes, have candidly and carefully stated the proposed decree's pluses and minuses. Class counsel have also vigorously pursued this case from its inception in 1985, expanding it from a simple discrimination-in-promotion claim to a broad lawsuit covering both hiring and promotions. Their dedication to their class clients cannot be questioned. Indeed, class counsel have assured the court that they will continue to devote their time and resources to the vigorous pursuit of this litigation should the court reject the proposed consent decree. Under these circumstances, the views of class counsel are due great weight.[13]

Nevertheless, the above factors weighing in favor of approval cannot counter the significant faults in the proposed decree. The paramount question before the court is whether the proposed settlement is fair to *all* members of the plaintiff classes. The court cannot sacrifice claims of absent class members in order to avoid litigation.

### ii.

Perhaps the strongest factor in favor of approval of the proposed settlement is class counsel's contention that the settlement reflects a compromise based on the substantial factual and legal obstacles that would have been presented at trial and the likely range of recovery. The court agrees that the decree's prospective provisions provide as much relief as most courts would order even if a finding of systematic discrimination were made; and the court must also agree that there is nothing to indicate whether the individual relief would be more or less after a full trial.

---

**13.** The court recognizes that class counsel will receive $145,000 under the proposed decree as attorney's fees. The court must therefore be sensitive to a potential conflict between the class counsel and the classes they represent because large fees are at stake. *See Pettway,* 576 F.2d at 1215. The court has carefully considered this factor and does not believe that it has any way colored class counsel's representa-

tions to the court about the value of the proposed decree to the plaintiff classes. The court is impressed that the fee awarded in the decree is substantially less than class counsel would be entitled to for the time and expenses they have incurred so far should they have prevailed at trial. Class counsel have themselves, therefore, significantly compromised their fee.

Class counsel pointed out that both of their theories for liability in this case, "disparate impact" and "disparate treatment," pose difficult legal and factual issues for them. The Supreme Court recently has made it substantially more difficult to establish a "disparate impact" claim. *See Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). According to the Court, the employee must first identify the specific employment practice challenged and, further, must show that the challenged practice falls significantly more harshly on one group than another, that is, that the practice under attack has created "adverse impact." *Id.* at 656, 109 S.Ct. at 2124. If this showing is made, there is a presumption that the practice is unnecessarily eliminating members of the former group and the burden then shifts to the employer to produce evidence of employment justification for the employment practice. The employer's burden is one of production not persuasion, for the burden of persuasion always remains with the employee. Finally, if the employer satisfies its burden, the employee may prevail only if he or she shows that the employer's justification for the practice has no basis in fact or that another practice, without a similarly undesirable adverse effect, would also serve the employer's legitimate employment interests. *Id.* at 660, 109 S.Ct. at 2126.

Class counsel have explained that their case is, at best, close as to whether any class member could prevail on a disparate impact claim that she or he was denied employment or promotion for racial reasons. They state that their case is close both as to establishing adverse impact and as to showing that the highway department's practice has no basis in fact or that another practice, without a similarly undesirable adverse effect, would also serve the department's legitimate employment interests. Indeed, class counsel argue that, in light of these difficulties, the hiring and promotion goals in the proposed consent decree are significant plums.

Class counsel have indicated that they face an equally difficult battle with their class-wide claims based on "disparate treatment." They state that they hope to establish these claims by showing through anecdotal evidence a pattern and practice of racial discrimination in employment and promotion within the department. They expected to do this by proving a number of individual claims of discrimination. They correctly note that, as to each claim, they would have to go through and survive the following analytical hoops. They would have the initial burden of establishing a *prima facie* case of unlawful discrimination by a preponderance of evidence, which once established raises a presumption that the employer discriminated against the employee. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Many different articulations of the Title VII *prima facie* case exist, varying with the context of the employment decision and the type of proscribed practice involved.[14] The essence of the *prima facie* case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the factfinder that the employer used prohibited criteria in making an adverse decision about the employee. Thus, the unifying themes of the various manifestations of the *prima facie* case are that the employee is a member of a protected group and that the employer has treated that employee differently from other members outside that protected group under the same or similar circumstances, to the employee's detriment. If the employee establishes a *prima facie* case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee. This may be done by the employer articulating a legitimate, nondiscriminatory reason for the employment decision, which is clear, reasonably specific and worthy of credence. The employer has a

---

**14.** *See, e.g., Hill v. Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533, 1538–39 (11th Cir.1988) (hiring); *Wu v. Thomas,* 847 F.2d 1480, 1483–84 (11th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989) (promotion).

burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *Burdine, supra.* Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination. The employee may satisfy this burden by persuading the court either directly that a discriminatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies his or her ultimate burden of demonstrating by a preponderance of the evidence that he or she has been the victim of unlawful discrimination. *Burdine, supra.*[15]

However, when an employee presents direct evidence of the employer's discriminatory motive, the framework set out in the text is substantially altered. In such a case, the employer bears more than a mere burden of production of a legitimate reason for the decision; the employer bears the burden of proving by a preponderance of the evidence that it would have made the same decision even if it had not used the proscribed criteria. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in the judgment) (espousing direct evidence threshold); *Jones v. Gerwens,* 874 F.2d 1534, 1539 n. 8 (11th Cir. 1989) (in dicta, apparently adhering to direct evidence threshold). *But cf.* 490 U.S. at 251, 109 S.Ct. at 1791 (plurality opinion) (declining to require direct evidence in all cases as a prerequisite to imposing burden of proof on employer); *id.,* 490 U.S. at 258, 109 S.Ct. at 1795 (White, J., concurring in the judgment) (unlawful motive must be a substantial factor in the decision, but unclear whether this requires a showing of direct evidence).

Class counsel point out that, because the department is under a merit system in which persons are appointed off of a register based on their ranking on the register, they found that it would be very difficult to establish that any particular black person was denied a job or a promotion because of his or her race. Most of their anecdotal evidence of racial discrimination will go toward establishing that there was a racially hostile environment in the department. Class counsel are concerned that, while this anecdotal evidence might warrant the court's imposing a broad but detailed injunction redressing the racially hostile environment in the department, it might be insufficient to support the promotion or hiring of any particular black person or to support the establishment of goals or quotas to redress past failures.

Indeed, according to class counsel, the ten who are to receive offers of employment under the settlement were selected because within the area of graduate civil engineering these ten were the only ones on the state register who, assuming race placed any role in the department's decision whether to hire or promote a person, were sufficiently high enough on the register that the department could conceivably have

---

**15.** To be sure, where a disparate treatment case has been fully tried, the court need not employ the full *Burdine* analysis, but may simply proceed directly to the ultimate issue of discrimination or retaliation. *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Moore v. Alabama State University,* 864 F.2d 103, 105 (11th Cir.1989). The court believes that trial courts should nonetheless use the *Burdine* analysis in fully tried cases in which the plaintiff relies on circumstantial evidence. Such cases pose difficult and sensitive issues of subjective intent and objective action. The *Burdine* analysis provides an invaluable method of weighing and considering evidence. By focussing the court's inquiry on the *prima facie* case,

the employer's justification, and the issue of pretext, *Burdine* helps to assure that the court arrives at its ultimate conclusion less through intuition and more through factual reasoning and analysis. *See, e.g., Noble v. Alabama Dep't of Environmental Management,* 872 F.2d 361, 365 n. 4 (11th Cir.1989); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984).

Of course, the *Burdine* analysis should not be applied too rigidly; nor should it be viewed as an end in itself. In other words, it should not be used by the court as a "substitute" for reaching the ultimate issue of whether the plaintiff has, in fact, been a victim of discrimination or retaliation. *Moore,* 864 F.2d at 105.

even considered them for appointment. They were therefore the only ones who had even colorable claims of intentional race discrimination as to the graduate civil engineering jobs.[16]

Although the above factors are compelling, they are insufficient to justify cutting off individual claims, which may have merit. The court agrees with class counsel that some of the relief in the proposed decree is substantial and noteworthy and would go far in redressing employment discrimination, which as Judge Vance emphasized again in *Holmes* "is one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies or chooses." *Holmes*, 706 F.2d at 1152, *quoting Culpepper v. Reynolds Metals Co.* 421 F.2d 888, 891 (5th Cir.1970). However, as Judge Vance continued, such relief may not be given "at the expense of the rights of absent members of classes certified under subsection (b)(2)." *Holmes*, 706 F.2d at 1152.

## IV. CONCLUSION

The court has fully examined the entire record in this case and carefully considered the many statements, both oral and written, in support of and in opposition to the proposed consent decree. As explained above, there are many factors which point in favor of approval of the decree. However, as further explained above, there are five critical factors which together conclusively counsel against it. First, the record developed by the parties is insufficient to support the difference in treatment between the six named plaintiffs and all the other class members. Second, the record is insufficient to justify a result which would in effect deny to hundreds of class members, whether they like it or not, an opportunity to have ever had their claims heard in a court of law. Third, there is nothing in the record upon which the court could base its affirmative approval of the EIT requirement. Fourth, the court cannot turn a blind eye to the fact that from the present record it appears that, of those class members who appear to have any interest in this litigation, the overwhelming majority strongly oppose it. And fifth and finally, the record is insufficient as to several issues regarding the legality of the proposed consent decree.

The decision the court reaches today does not mean, however, that a settlement cannot be reached in this case. Counsel for the parties may still pursue settlement. As stated, voluntary settlement is the preferred means of resolving class action employment discrimination disputes. However, with any future settlement, counsel for the parties must address the concerns and cure the faults identified by the court in this order.

Finally, the court cannot close without again emphasizing that it has reached the decision to reject the settlement with great reluctance. As stated, counsel for plaintiffs have demonstrated admirable dedication to this litigation; they have vigorously and ethically pursued it, including the investment of many hours and dollars. Nevertheless, as class counsel they must surely understand that the sole issue before the court is whether the proposed consent decree is fair, reasonable, and adequate for the three plaintiff classes certified by the court. Because the court cannot say that under established law the decree is, the court has no choice but to reject it.

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court that:

---

**16.** Class counsel are unclear as to whether their observation—that there were only ten blacks high enough on the register for consideration by the department—applied only to graduate civil engineering positions or to all merit jobs in the highway department. If the observation does not apply to all merit jobs, then the court has concerns as to why only applicants for graduate civil engineering jobs received this special treatment. Again, the question is raised as to whether the class should be treated as a subsection (b)(3) class to the extent individual relief is sought.

(1) The parties' joint motion for final approval of the proposed consent decree be and it is hereby denied; and

(2) The proposed consent decree be and it is hereby not approved.